[No. 52946-3-I. Division One. May 3, 2004.]

THE AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON, *Appellant*, v. THE CITY OF SEATTLE, *Respondent*.

---

*Traci A. Sammeth*; and *Aaron H. Caplan* (of *American Civil Liberties Union of Washington*), for appellant.

*Thomas A. Carr, City Attorney*, and *Jessica Nadelman, Assistant*, for respondent.

*Noel Mcmurtray* of Public Service and Industrial Employees Local 1239 Union, amicus curiae.

AGID, J. — The American Civil Liberties Union (ACLU) appeals a trial court decision that records it requested under the public disclosure act (Act), RCW 42.17.250-.348, were exempt from disclosure under the deliberative process exemption to the Act, and under the Open Public Meetings Act of 1971

(chapter 42.30 RCW) (OPMA). Although we conclude as a matter of law that the OPMA does not protect written documents from disclosure, we cannot determine on this record whether the documents at issue in this case are exempt under the Act. We remand for in camera review of the documents.

## FACTS

The Seattle Police Officers Guild (Guild) is a private labor union representing Seattle police officers on labor and employment issues. In November 2002, in anticipation of new contract negotiations with the City of Seattle, the Guild gave the City a list of issues it planned to address in the negotiations. In return, the City provided the Guild with its list of issues for negotiation. The ACLU requested a copy of both lists under the Act, chapter 42.17 RCW. The City refused to disclose the lists because it believed they were exempt from disclosure under the Act. The ACLU then filed a lawsuit to force the City to disclose the lists. Neither party requested in camera review of the documents, and the trial court did not review them. The trial court ruled in favor of the City, concluding that the lists were exempt from the Act because they were part of the deliberative process. It also ruled that the OPMA protected the documents from disclosure. The ACLU appeals.

## ANALYSIS

### I. Public Disclosure Act

 "The public records portion of the public disclosure act . . . requires all state and local agencies to disclose any public record upon request, unless the record falls within certain very specific exemptions."[1] The purpose of the Act is to ensure that the people of Washington remain sovereign and that public officials and institutions remain account-

---

[1] *Progressive Animal Welfare Soc'y (PAWS) v. Univ. of Wash.*, 125 Wn.2d 243, 250, 884 P.2d 592 (1994).

able to the people for their decisions.[2] The Act's provisions must be liberally construed to promote the public policy, and exemptions from it must be strictly construed.[3] When an agency refuses to disclose information, it bears the burden of proving that its refusal is valid based on one of the exemptions included in the Act.[4]

██ RCW 42.17.310(1)(i) exempts from disclosure

[p]reliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended except that a specific record shall not be exempt when publicly cited by an agency in connection with any agency action.

The purpose of this deliberative process exemption—protecting the give-and-take of deliberations that are necessary to formulate agency policy—severely limits the scope of the exemption.[5] In order to invoke this exemption,

an agency must show that [1] the records contain predecisional opinions or recommendations of subordinates expressed as part of a deliberative process; [2] that disclosure would be injurious to the deliberative or consultative function of the process; [3] that disclosure would inhibit the flow of recommendations, observations, and opinions; and [4] . . . that the materials covered by the exemption reflect policy recommendations and opinions and not the raw factual data on which a decision is based.[6]

An appellate court reviews de novo a trial court's decision about whether documents or records fall under an exemption to the Act.[7]

██ We must determine in this case whether the lists qualify as "predecisional opinions or recommendations . . .

---

[2] RCW 42.17.251.

[3] *Id.*

[4] *King County v. Sheehan*, 114 Wn. App. 325, 336, 57 P.3d 307 (2002).

[5] *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 133, 580 P.2d 246 (1978).

[6] *PAWS*, 125 Wn.2d at 256.

[7] *Id.* at 252.

expressed as part of the deliberative process."[8] Resolving this question turns on how the lists were generated and their function in the context of the decision-making process. We have only the parties' differing characterizations of the lists on which to resolve this issue. The ACLU asserts that the lists are each party's final decision on which issues are important to them in the bargaining process. The City counters that the issue lists include opinions about what the negotiators may discuss and do not contain final policy decisions. The City characterizes them as a "wish list or tentative agenda" for issues both parties will resolve in the upcoming "give-and-take" negotiations that precede the final policy decision by the city council. While the City has seen the lists and the ACLU has not, we do not think it wise to adopt one party's characterization without subjecting it to a neutral, independent review. Without more information about the lists, such as what they actually contain, how they were generated, and who generated them, neither we nor the trial court can properly determine whether they are exempt from disclosure under the Act.[9] Accordingly, we remand for in camera review in the trial court.[10] We do not, however, need to review the lists to resolve several other issues the parties have raised and briefed. In the interest of judicial economy, we address them below.

The ACLU asserts that the issue lists in this case do not fall under the Act's deliberative process exemption because they are not intra-agency records, nor were they prepared by a governmental agency or a "subordinate," and the City has not shown that disclosure would be injurious to the

[8] *Id.* at 256.

[9] *See Limstrom v. Ladenburg*, 136 Wn.2d 595, 615, 963 P.2d 869 (1998) (remanding for in camera review in a public disclosure case, stating that " 'the only way that [the] court can accurately determine what portions, if any, of the file are exempt from disclosure is by an in camera review of [the files].' ") (quoting *Newman v. King County*, 133 Wn.2d 565, 583, 947 P.2d 712 (1997) (Alexander, J., dissenting)).

[10] For the same reason, we cannot determine whether the lists contain facts, rather than opinions, which would have to be disclosed under *Brouillet v. Cowles Publishing Co.*, 114 Wn.2d 788, 791 P.2d 526 (1990).

deliberative function or inhibit the flow of recommendations, observations, and opinions. We disagree.

First, the statute does not limit the exemption to intra-agency documents prepared by a government agency. While the statute does exempt intra-agency documents, it also exempts "[p]reliminary drafts, notes, [and] recommendations . . . in which opinions are expressed or policies formulated or recommended."[11] The term "intra-agency" in the exemption does not subsume but is in addition to the other forms of communication the exemption lists. This interpretation is consistent with case law. For instance, in *PAWS*,[12] the court exempted from public disclosure documents prepared by scientists employed outside of a state agency. The Progressive Animal Welfare Society had made a public disclosure request for a copy of an unfunded grant proposal involving rhesus monkeys.[13] After the grant proposal was reviewed and approved at several levels within the University of Washington, it was submitted to the National Institutes of Health (NIH) for funding.[14] There, a group of scientists review the proposal and create peer review evaluations called "pink sheets," which critique the proposal and recommend approval or disapproval.[15] After it makes its funding decision, the NIH gives the pink sheets to the applicant, who often revises and resubmits rejected proposals based on the comments and suggestions in the pink sheets. The court held that while disclosing the unfunded proposals themselves did not reveal any deliberative policy-making process, the pink sheets pertaining to unfunded proposals did because they were part of an ongoing process.[16] Accordingly, it concluded they were ex-

---

[11] RCW 42.17.310(1)(i).

[12] *Progressive Animal Welfare Soc'y (PAWS) v. Univ. of Wash.*, 125 Wn.2d 243, 884 P.2d 592 (1994).

[13] *Id.* at 247.

[14] *Id.* at 248.

[15] *Id.*

[16] *Id.* at 257. The court noted that once the proposal became funded, the policy is clearly implemented, so the "pink sheets" would become disclosable.

empt from disclosure under the Act.[17] The NIH is obviously not a state agency, so the exempt documents could not be "intra-agency" memoranda. Rather, they were "recommendations" made as part of the deliberative process.

■ Nor does the statute require that exempt documents be prepared by subordinates. We recognize that the *PAWS* court recites that term in its articulation of the test,[18] but this is not part of its holding and indeed is contrary to its ruling protecting the pink sheets from disclosure. And the word "subordinate" does not appear anywhere in the relevant sections of the statute. The pink sheets the court held were exempt from disclosure in *PAWS* were not prepared by the University or any of its subordinates, and the NIH scientists who prepared them were not employees or subordinates of the University. Rather, they were documents prepared by members of an organization outside of the University whose independent scientists evaluated proposals as part of a "quintessentially deliberative process."[19] The statute does not require or even suggest that exempt documents must be prepared by subordinates.

---

[17] We reject the ACLU's argument that because all the agencies in *PAWS* were government agencies, the "pink sheets" were intra-agency documents. "Agency" is defined in the Act as including "all state agencies and all local agencies." RCW 42.17.020(1). The definition does not include federal agencies like the NIH.

[18] *PAWS*, 125 Wn.2d at 256. The test articulated in *PAWS* was based on the Washington Supreme Court's discussion in *Hearst* of the deliberative process exception in the Freedom of Information Act (FOIA). The FOIA provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" are exempt. 5 U.S.C. § 552(b)(5). The court noted that the FOIA's provision is parallel to Washington's Act and helpful in interpreting Washington's statute. But when strictly applied, the FOIA test is narrower than the Washington exemption, which does not require that the documents be created by "subordinates." The language appears to have arisen out of facts specific to *National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 136-37, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975). And, as the City points out, although courts have stated the exemption applies to predecisional opinions of subordinates, no court has held that the exemption is *limited* to documents written by subordinates.

[19] *PAWS*, 125 Wn.2d at 257. The ACLU attempts to distinguish the pink sheets from the lists in this case because they involved scientific trade secrets. But the scientific information to which they refer would be exempt under the valuable research exemption. *Id.* at 254-55 (citing RCW 42.17.310(1)(h)). The part of the court's opinion we discuss here includes only its decision that the pink sheets were exempt based on the deliberative process exception.

■ We also conclude that the City has established that disclosure would be injurious to the deliberative or consultative function and inhibit the negotiation process. It submitted eight declarations explaining the negative impact of disclosure on successful negotiations. The declarations discuss the importance of keeping collective bargaining confidential, as well as how merely disclosing tentative issue lists, like those in this case, could negatively affect the process of reaching agreement through negotiations.[20] The ACLU argues that the City has not met its burden because although it provides evidence that the disclosure would affect the flow of information in negotiations between the City and the Guild, it fails to show that disclosing the lists would inhibit the flow of recommendations, observations, and opinions among the City's *policymakers*. This distinction is not persuasive. The negotiations themselves are an integral part of a deliberative process that culminates in the policies the City decides to adopt concerning the police department. The lists are only a starting point for a complex and delicate policy-making process. If the negotiations are negatively impacted, then so would be the City's deliberative policy-making process.

The problem with the ACLU's position on this issue is that it fails to recognize that labor negotiations are an ongoing process in which the City's negotiators, like the Guild's representatives, must respond to the ever-changing tableau of collective bargaining. The City's negotiators are not free to adopt their own strategies and priorities for the

---

[20] The declarations from city employees, union representatives, and the King County Labor Liaison establish that it would disrupt and politicize the bargaining process to prematurely publicize the proposals of parties in the bargaining process. Public scrutiny of contract issues discussed prior to completing negotiations might be misconstrued, and disclosure would hinder a vital part of the bargaining process—the free exchange of views, opinions, and proposals. In their amicus curiae brief, the Public Service and Industrial Employees and the Local 1239 Union mirror these concerns, stating, "Confidentiality during negotiations is essential to union members because it facilitates full and frank discussions between the parties . . . [and] [w]ithout a temporary period of nondisclosure, the confidentiality critical to collective bargaining would be extinguished." In addition, amicus points out that if the lists were disclosed, public scrutiny of the issues, which would be taken out of context and distorted by the media, would impede negotiations.

city council. Rather, they must confer with the governing body on a regular basis to adopt and respond to the proposals and counterproposals that emerge from sessions at the bargaining table. This ongoing process involves negotiators and City officials in what is the essence of the deliberative process. Until the results of this policy-making process are presented to the city council for adoption, politicization and media comments will by definition inhibit the delicate balance—the give-and-take of the City's positions on issues concerning the police department.[21]

## II. Open Public Meetings Act

 Finally, we address the City's argument that the documents are exempt by virtue of the OPMA. Under the Act, even if records are not included in a specific exemption listed in RCW 42.17.310 and 42.17.315, they may still be exempt if they are included in "[an]other statute which exempts or prohibits disclosure of specific information or records."[22] This derivative exemption "applies only to those exemptions explicitly identified in other statutes . . . [and it] does not allow a court 'to imply exemptions but only allows specific exemptions to stand.' "[23] The trial court concluded that the OPMA is one of these "other statute[s]." The OPMA requires that "[a]ll meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency . . . ."[24] But it exempts

[c]ollective bargaining sessions with employee organizations, including contract negotiations, grievance meetings, and discussions relating to the interpretation or application of a labor agreement; or (b) that portion of a meeting during which the governing body is planning or adopting the strategy or position

---

[21] Under the City of Seattle's Charter, the city council must adopt the agreement before it becomes effective. Art. XVI, § 9.

[22] RCW 42.17.260(1).

[23] *PAWS*, 125 Wn.2d at 262 (quoting *Cowles*, 114 Wn.2d at 800).

[24] RCW 42.30.030.

to be taken by the governing body during the course of any collective bargaining, professional negotiations, or grievance or mediation proceedings, or reviewing the proposals made in the negotiations or proceedings while in progress.[25]

The ACLU contends that the OPMA exempts only face-to-face meetings, not written materials. To rule that the OPMA translates into a blanket exemption for all records pertaining to labor negotiations, it argues, would require the court to imply an exception, which is forbidden under the Act. We agree. The OPMA does not expressly exempt written materials from disclosure, and we may not imply an exemption.[26]

The OPMA exempts information exchanged during collective bargaining negotiations from the open meetings requirements. Specifically, it protects from disclosure information that is exchanged during *that portion of a meeting* during which the governing body is planning or adopting the strategy or position to be taken by the governing body during the course of any collective bargaining . . . .[27] Because the protection does not explicitly include documents, the OPMA cannot be construed as an "other statute" that applies to the issues lists in this case. Other Washington cases that have examined the "other statute" exception are instructive here.

In *PAWS*,[28] the Supreme Court discussed two statutes which exempt trade secret information and the names of researchers in order to determine whether they were "other" statutes that protected this information from public disclosure under the Act. Both statutes expressly identified situations where courts could prohibit disclosure of particular information. The state Uniform Trade Secrets Act (chapter 19.108 RCW) (UTSA) provides broad means for courts to preserve the secrecy of trade secrets, and it expressly states

---

[25] RCW 42.30.140(4)(a).

[26] *PAWS*, 125 Wn.2d at 262.

[27] RCW 42.30.140(4)(b) (emphasis added).

[28] 125 Wn.2d 243.

that "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."[29] The *PAWS* court concluded that this statute created an independent limit on disclosure of some portions of the records in that case.

The court also discussed a statute which expressly states that anyone who is employed at a research facility where animals are used for research can " 'apply for injunctive relief to prevent . . . harassment.' "[30] It concluded that this "other statute" suggests the legislature clearly intended to prevent harassment against animal researchers. Accordingly, although the names of researchers in that case had already been revealed, it concluded the names of researchers did not have to be revealed in future cases under the Act, "provided the anti-harassment statute is properly invoked and its criteria met."[31] Both of these statutes have express language granting courts authority to enjoin or protect particular information from disclosure, so the court did not need to imply an exemption to categorize them as "other statutes" under the Act. In contrast, a decision to exempt specific written material pertaining to collective bargaining negotiations under the OPMA, which exempts only collective bargaining negotiations from the requirement of public meetings, would require us to imply an

---

[29] RCW 19.108.020(3). RCW 19.108.020 provides:

(1) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(2) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(3) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

[30] *PAWS*, 125 Wn.2d at 263 (quoting RCW 4.24.580).

[31] *Id.* at 264.

exemption the legislature did not explicitly include in the statute.[32]

The OPMA's relation to the written materials created before and during collective bargaining negotiations is more analogous to the statute and documents discussed in *Brouillet v. Cowles Publishing Co.*[33] In *Cowles*, a publishing company sought disclosure under the Act of records detailing the reasons for teacher certificate revocations during a 10-year period. The Supreme Court ordered release of the records. While it relied primarily on its conclusion that the documents at issue included facts, not opinions or recommendations, the court also rejected the argument that a statute granting teachers a right to a closed hearing on certificate revocations[34] was an "other statute" for purposes of the Act. It stated, "The closed hearing provision does not specifically exempt anything from disclosure. . . . [and] [t]he language of the [public disclosure] statute does not authorize us to imply exemptions but only allows specific exemptions to stand."[35] Like the statute discussed in *Cowles*, the OPMA does not specifically exempt anything other than meetings from disclosure. Although the legislature's decision to exempt collective bargaining negotiations from the OPMA suggests the material prepared for those negotiations could be protected from disclosure, absent express language in the statute, we may not so conclude. Because there is no express exemption in the OPMA protecting written collective bargaining materials, we hold they are not protected from disclosure by OPMA as an "other statute" under the Act.

---

[32] We recognize, as no doubt the trial court did, that the OMPA's exemption for labor negotiations expresses the public policy we discussed above in the context of the Act—the need for privacy, albeit temporary, while negotiations are ongoing and the governmental agency is formulating its responses and policy positions. While this supports our conclusion that these are part of the deliberative process under the Act, the OPMA still does not exempt labor negotiation documents.

[33] 114 Wn.2d 788, 791 P.2d 526 (1990).

[34] RCW 28A.58.455(2).

[35] *Cowles*, 114 Wn.2d at 800.

558

Affirmed in part, reversed in part and remanded.

GROSSE and SCHINDLER, JJ., concur.