**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| CITIZEN ACTION DEFENSE FUND, a Washington nonprofit organization, | No. 58331-3-II |
| Respondent, | |
| v. | |
| WASHINGTON STATE OFFICE OF FINANCIAL MANAGEMENT in the OFFICE OF THE GOVERNOR, an agency of the State of Washington, | PUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—State representatives from the Washington State Office of Financial Management (OFM) negotiated collective bargaining agreements (CBAs) with union representatives for the 2023-25 biennium. In October 2022, Citizen Action Defense Fund (CADF) submitted a request under the Public Records Act (PRA)[1] seeking the original proposals made by the state and the unions for the 2023-25 collective bargaining cycle. OFM denied the request, stating that the records were exempt from disclosure under the deliberative process exemption statute, RCW 42.56.280. CADF filed a lawsuit against OFM in December 2022, alleging a violation of the PRA. The case proceeded to a bench trial where the superior court found that the records were not pre-decisional at the time OFM denied the request, meaning that the deliberative

---

[1] Ch. 42.56 RCW.

process exemption did not apply and OFM violated the PRA. The court ordered OFM to produce the records and pay statutory penalties as well as attorney fees and costs. OFM appeals.

We hold that the superior court erred in concluding that the requested records were not pre-decisional at the time OFM denied the PRA request. While the tentative agreements were signed by state and union representatives prior to CADF's request, they were not yet final for purposes of the deliberative process exemption because the agreements had not been presented to the governor for approval, nor had they been funded by the legislature. Accordingly, we reverse.

FACTS

I. COLLECTIVE BARGAINING NEGOTIATIONS

Negotiations between representatives for the State of Washington and representatives for the various collective bargaining units representing state employees for the 2023-25 biennium CBAs began prior to June 2022. As required by RCW 41.80.010(3)(a), the tentative CBAs were sent to the director of OFM prior to October 1, 2022. At that time, the tentative agreements were signed by representatives from the State and the unions. On December 12, 2022, after finding that the CBAs were financially feasible for the State, the director of OFM sent the agreements to the governor. As required by statute, the governor then presented the proposed budget to the legislature, requesting the necessary funds for implementation. RCW 41.80.010(3). The governor

No. 58331-3-II

did so for the proposed 2023-25 budget prior to the start of the legislative session in early January 2023.[2]

On April 23, 2023, the legislature passed a bill approving the funds for the proposed budget.[3] After vetoing certain provisions, the governor signed the budget bill on May 16, 2023.[4] According to the Labor Relations and Compensation Policy section chief at OFM, after the legislature approves the funding and the bill is signed by the governor, the final CBAs are then signed by lead negotiators, union leadership, and the governor. "These final signatures take the place of the signatures of the union and State lead negotiators on the [tentative agreements]." Clerk's Papers (CP) at 214. The new CBAs took effect on July 1, 2023, and remain in effect through June 30, 2025.[5]

II. PUBLIC RECORDS REQUEST

On October 20, 2022, the executive director of CADF requested that OFM provide " 'a copy of the state's and union[s'] original offer[s].' " CP at 113 (quoting CP at 114 (an earlier

---

[2] *See* WASH. OFF. OF FIN. MGMT., A GUIDE TO THE WASHINGTON STATE BUDGET PROCESS (Aug. 2023),
https://ofm.wa.gov/sites/default/files/public/publications/WaStateBudgetProcessGuide.pdf [https://perma.cc/7U6Y-NYYR]; WASH. OFF. OF GOVERNOR, PROPOSED 2023-25 BUDGET AND POLICY HIGHLIGHTS (Dec. 2022), https://ofm.wa.gov/sites/default/files/public/budget/statebudget/highlights/budget23/202325PolicyBudgetHighlights.pdf [https://perma.cc/DB4W-L8FX].

[3] *See 2023-25 Enacted Budgets*, WASH. OFF. OF FIN. MGMT., https://ofm.wa.gov/budget/state-budgets/2023-25-enacted-budgets [https://perma.cc/X7AW-Z2UK]; *2023 Budget Summary*, WASH. ST. FISCAL INFO., https://fiscal.wa.gov/budgetsummary [https://perma.cc/C2HC-MFJT].

[4] *See 2023-25 Enacted Budgets*, WASH. OFF. OF FIN. MGMT.; LAWS OF 2023, ch. 475, governor's veto message [https://perma.cc/9B6H-VGUM].

[5] *See* WASH. OFF. OF FIN. MGMT., A GUIDE TO THE WASHINGTON STATE BUDGET PROCESS (Aug. 2023).

request for the records sent from a different organization)). CADF argued that the deliberative process exemption did not apply. On October 26, counsel from OFM responded that the deliberative process exemption did apply, as the original offers were "negotiation-related material created as part of the collective bargaining process," and the exemption applied "*until those negotiations are complete and the agreements are final*." *Id.* at 111 (emphasis in original). Counsel explained that the collective bargaining process is not complete "until the final approval of the contracts by the legislature and the signing of that approval into law by the governor." *Id.*

### III. PROCEDURAL HISTORY

On December 15, 2022, after OFM denied CADF's request for the parties' original offer letters in CBA negotiations, CADF filed a lawsuit against OFM alleging violations of the PRA. CADF asked the court to order OFM to provide the records, and award attorney fees and costs, as well as statutory penalties. OFM denied the allegations.

The superior court held a hearing on the merits of the PRA lawsuit. CADF argued that after deliberation between the state and union representatives concludes, the records become disclosable. According to CADF, "once the parties have signed that agreement and it is then submitted to OFM, . . . then that agreement is final." Verbatim Rep. of Proc. (VRP) (Mar. 31, 2023) at 13-14. The State's argument relied, in part, on *Progressive Animal Welfare Society v. University of Washington*, 125 Wn.2d 243, 884 P.2d 592 (1994) (*PAWS*) (plurality opinion) (holding that records cease to be protected under the deliberative process exemption once the proposed polices are implemented or funded). The State explained, "In *PAWS*, it was the funding that triggered the end of that deliberative process," and as such, the requested records are protected under the exemption until they are funded. VRP (Mar. 31, 2023) at 32.

The superior court ruled in CADF's favor, ordering OFM to produce the requested records, pay statutory penalties amounting to $1,104.00, and pay attorney fees and costs amounting to $33,172.51. The superior court found that "the requested documents were wrongfully withheld because the deliberative process exemption did not apply, as the documents were no longer pre[-]decisional at the time of CADF's request." CP at 192. As to the remaining *PAWS* factors, the superior court found that "pre[-]decisional disclosure would be injurious to the deliberative process, would inhibit the flow of opinions, and contain policy recommendations and opinions, not facts." *Id.* at 191. The court found, however, that even though OFM successfully established these three *PAWS* factors, the deliberative process exemption did not apply as the deliberative process concluded when the CBAs were signed by the State's and unions' representatives, and therefore, the records were no longer pre-decisional at the time OFM denied CADF's request.

## ANALYSIS

OFM argues that CBAs are not final until the tentative agreements are approved for funding by the legislature and signed by the governor. According to OFM, "[t]he deliberative process exemption of the PRA continues until the statutory processes finalizing the tentative CBAs is complete, at which point the bargaining process ends." Br. of Appellant at 22. As such, because the 2023-25 CBAs had not yet been approved by the legislature or signed by the governor at the time of CADF's request in October 2022, OFM contends that the requested records were covered by the deliberative process exemption and the superior court erred in holding otherwise.

In response, CADF maintains that the requested offer letters were not pre-decisional at the time of CADF's request. CADF argues that the bargaining process is entirely separate from the legislative process of granting budget proposals. As such, according to CADF, at the time of the

request, the deliberative process was complete and therefore the exemption to disclosure no longer applied to the requested records.

We agree with the State and hold that the records at issue in this case were pre-decisional at the time the PRA request was denied. At the time OFM denied the PRA request, the tentative CBAs had not been sent to the governor or legislature for approval, much less received the approval and funding necessary for their implementation. The parties' signatures on the tentative CBAs in October 2022 did not effectively "execute" the agreements, as the new CBAs were not approved and funded by the legislature until April 23, 2023.[6] Accordingly, we hold that the records pertaining to the CBA negotiations were exempt from disclosure at the time OFM denied CADF's request on October 26, 2022 under RCW 42.56.280, the deliberative process exemption to the PRA. This result is compelled by our supreme court's decision in *PAWS* and a plain reading of RCW 41.80.010.

## I. OFM'S DENIAL OF THE PRA REQUEST

A. Standard of Review

We review a superior court's decision on whether an agency violated the PRA, as well as the decision of whether particular records are exempt from disclosure under the PRA, de novo. *Am. Civ. Liberties Union of Wash. v. City of Seattle*, 121 Wn. App. 544, 549, 89 P.3d 295 (2004) (*ACLU I*).

---

[6] *See 2023-25 Enacted Budgets*, WASH. OFF. OF FIN. MGMT.

B. Legal Principles

*1. The Public Records Act and the Deliberate Process Exemption*

The PRA "requires all state and local agencies to disclose any public record upon request, unless the record falls within certain very specific exemptions." *PAWS*, 125 Wn.2d at 250. The Act's purpose is to hold public officials and institutions accountable. *ACLU I*, 121 Wn. App. at 548-49. "The Act's provisions must be liberally construed to promote the public policy, and exemptions from it must be strictly construed. When an agency refuses to disclose information, it bears the burden of proving that its refusal is valid based on one of the exemptions included in the Act." *Id.* at 549.

The PRA contains an exemption known as the deliberative process exemption. The deliberative process exemption provides:

> Preliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended are exempt under this chapter, except that a specific record is not exempt when publicly cited by an agency in connection with any agency action.

RCW 42.56.280. "The purpose of this exemption is to permit 'frank and uninhibited discussion during the decision-making process.' " *West v. Port of Olympia*, 146 Wn. App. 108, 116, 192 P .3d 926 (2008) (quoting *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 132, 580 P.2d 246 (1978)).

In *PAWS*, the supreme court considered whether the deliberative process exemption applies to university grant proposals. The grant proposals in question included documents known as "pink sheets," which are "formal written evaluation[s]" of the grant proposals provided by "scientists with expertise in the area of the proposed research." *PAWS*, 125 Wn.2d at 248. The court held that "[w]hile the unfunded grant proposal itself does not reveal or expose the kind of deliberative or policy-making process contemplated by the exemption, the so-called 'pink sheets' do." *Id.* at 257.

7

The court held that the "pink sheets" were exempt from disclosure under the deliberative process exemption because they "foster a quintessentially deliberative process." *Id.*

The court issued a four-part test that an agency must meet in order to rely on the deliberative process exemption. *Id.* at 256-57. An agency must show that:

> [1] the records contain pre[-]decisional opinions or recommendations of subordinates expressed as part of a deliberative process; [2] that disclosure would be injurious to the deliberative or consultative function of the process; [3] that disclosure would inhibit the flow of recommendations, observations, and opinions; and finally, [4] that the materials covered by the exemption reflect policy recommendations and opinions and not the raw factual data on which a decision is based. . . . Subjective evaluations are not exempt under this provision if they are treated as raw factual data and are not subject to further deliberation and consideration.

*Id.* (internal citation omitted).

"Once the policies or recommendations are implemented, the records cease to be protected under this exemption." *Id.* at 257. The deliberative process exemption expires when the decision at issue is implemented. *Id.* In *PAWS*, the supreme court held that "[o]nce the proposal becomes funded, it clearly becomes 'implemented' for purposes of this exemption." *Id.*

The parties in this case also cite to two cases from Division One of this court. In *ACLU I*, Division One was asked to determine whether lists of negotiation issues that the city and the police union prepared in anticipation of negotiating a new labor contract were the type of record that could be initially withheld under the deliberative process exemption. *ACLU I*, 121 Wn. App. 549-50. In applying the first factor of the four-factor *PAWS* test, the court was unable to determine whether the records in question (the lists) were pre-decisional. *Id.* at 550. The court remanded the case to the superior court to resolve that question. *Id.* But the court went on to discuss the other three *PAWS* factors. As it related to the question of whether disclosure of the lists—assuming they

were, in fact, pre-decisional—would be injurious to the deliberative process (the second *PAWS* factor), the court stated:

> The problem with the ACLU's position on this issue is that it fails to recognize that labor negotiations are an ongoing process in which the City's negotiators, like the Guild's representatives, must respond to the ever-changing tableau of collective bargaining. The City's negotiators are not free to adopt their own strategies and priorities for the city council. Rather, they must confer with the governing body on a regular basis to adopt and respond to the proposals and counterproposals that emerge from sessions at the bargaining table. This ongoing process involves negotiators and City officials in what is the essence of the deliberative process. *Until the results of this policy-making process are presented to the city council for adoption*, politicization and media comments will by definition inhibit the delicate balance—the give-and-take of the City's positions on issues concerning the police department.

*Id.* at 553-54 (emphasis added). Thus, the court held, disclosure would be injurious to the deliberative process. *Id.* at 553.

Later, in *West*, Division One interpreted *ACLU I* and held "the *ACLU* court impliedly held that the [deliberative process] exemption applied only until the results of the policy-making process were presented to the city council for adoption." 146 Wn. App. at 118. In *West*, a PRA request was made seeking records pertaining to lease negotiations between the Port of Olympia and Weyerhaeuser. *Id.* at 112. Division One held that the lease had been executed by the time PRA request was made and the Port therefore erred in relying on the deliberative process exemption in withholding the records. *Id.* at 118.[7] The *West* court's discussion of *ACLU I* occurs solely in the context of discussing the *superior court's* reliance on *ACLU I* in making its decision on the merits of the PRA lawsuit.

---

[7] It is noteworthy that the court in *West* does not explain its holding that the lease had been "executed" in that case. The factual recitation does not enlighten the reader about what occurred that led the court to conclude that the lease had been executed. *West*, 146 Wn. App. at 112-15.

The discussion in *West* about *ACLU I* came about only because the *superior court* in that case relied on *ACLU I* in making its decision on the merits of the PRA lawsuit and the *West* court disagreed with the superior court's interpretation of the case. But because our review of whether an agency violated the PRA is de novo, we need not *even address* the superior court's reasoning in support of its merits decision. Furthermore, because the *West* court held that the lease had already been executed without relying on this language from *ACLU I*, this portion of *West* is, arguably, dictum.

*2. Collective Bargaining Agreements*

The deliberative process exemption to the PRA applies to "[p]reliminary drafts, notes, recommendations, and intra-agency memorandums." RCW 42.56.280. CBA negotiations involve such documents. *ACLU I*, 121 Wn. App. at 548-50. RCW 41.80.010 addresses "[n]egotiation and ratification of collective bargaining agreements [and] [f]unding to implement modification of certain collective bargaining agreements." (Boldface omitted.) In relevant part, the statute reads:

> (3) The governor shall submit a request for funds necessary to implement the compensation and fringe benefit provisions in the master collective bargaining agreement or for legislation necessary to implement the agreement. Requests for funds necessary to implement the provisions of bargaining agreements shall not be submitted to the legislature by the governor unless such requests:
> (a) Have been submitted to the director of the office of financial management by October 1 prior to the legislative session at which the requests are to be considered; and
> (b) Have been certified by the director of the office of financial management as being feasible financially for the state.
> The legislature shall approve or reject the submission of the request for funds as a whole. The legislature shall not consider a request for funds to implement a collective bargaining agreement unless the request is transmitted to the legislature as part of the governor's budget document submitted under RCW 43.88.030 and 43.88.060. If the legislature rejects or fails to act on the submission, either party may reopen all or part of the agreement or the exclusive bargaining representative may seek to implement the procedures provided for in RCW 41.80.090.

No. 58331-3-II

RCW 41.80.010(1-3).

C. Application

We hold that the deliberative process exemption had not yet expired when CADF's public records act request was denied by OFM. This is so because the tentative CBA had not yet even been submitted to the governor as contemplated by RCW 41.80.010(3), much less approved and funded by the legislature, at the time the request was denied. Thus, the superior court erred when it found that the deliberative process exemption expired.

The State, relying on RCW 41.80.010(3), argues that before a CBA can be implemented, it must go through several steps. First, it must be presented to the director of OFM and certified to be financially feasible for the State. RCW 41.80.010(3). As the State notes, this is not a mere formality—the OFM director can reject the agreement.[8] Following certification by the OFM director, the governor "shall submit a request for funds necessary to implement the compensation and fringe benefit provisions in the master collective bargaining agreement or for legislation necessary to implement the agreement." RCW 41.80.010(3). Finally, the legislature must " 'approve or reject the submission of the request for funds.' " Br. of Appellant at 10 (quoting RCW 41.80.010(3)(b)). Failure by the legislature to fund the tentative CBA results in the non-implementation of the CBA. RCW 41.80.010(3)(b).

CADF contends that the deliberative process exemption expired when the tentative CBA was signed by the unions' representatives and the State's negotiators, the same point at which the superior court held that the exemption expired. Alternatively, CADF contends that it expired when

[8] *See Serv. Emps. Int'l Union Healthcare 1199NW v. State – Off. of Governor*, No. 22289-U-09-5685 (Wash. Pub. Emp't Rels. Comm'n Apr. 1, 2009), https://decisions.perc.wa.gov/waperc/decisions/en/172027/1/document.do.

11

the tentative agreement was posted on the OFM website. In support of its argument, CADF posits that the legislative approval contemplated by RCW 41.80.010(3) is, essentially, a rubber stamp "legislative" function that is wholly unrelated to the collective bargaining process. *See* Br. of Resp't at 18-24. Because the legislature was not directly involved in the bargaining process, CADF argues, the deliberate process concluded before the tentative CBA was presented to the legislature for approval and funding.

*PAWS* governs our decision. The issue in this case centers on the first factor in *PAWS*—whether the records were pre-decisional. To determine whether the records were pre-decisional, we must determine when the deliberative process exemption expired. Pursuant to *PAWS*, the deliberative process exemption applies until the proposal (in this case, the tentative CBA) is implemented. *PAWS*, 125 Wn.2d at 256-57. Implementation occurs when a proposal is approved by the entity tasked with granting such approval. *Id*. at 257. "Once the proposal becomes funded, it clearly becomes 'implemented' for purposes of this exemption." *Id*. Applying *PAWS* to RCW 41.80.010(3), implementation occurs when the legislature approves the request to fund the CBA.

CADF relies on *West*, arguing, "Here, the policymaking has also been completed and for the same reason [as in *West.*] The agreements were only waiting for a yay or nay from the [l]egislature, all deliberation and bargaining were complete." Br. of Resp't at 23. But CADF fails to appreciate the factual differences between *West* and this case. *West* involved a port commission, an agency that performs both executive and legislative functions. *See e.g*., RCW 53.04.010(1) (authorizing port commissions to acquire, construct, maintain, operate, develop, and regulate within a variety of facilities and situations); RCW 53.08.080 (authorizing port districts to "lease all lands, wharves, docks and real and personal property owned and controlled by it, for such

purposes and upon such terms as the port commission deems proper"). Moreover, in *West* the lease had already been executed when the Port of Olympia denied the release of records related to the lease negotiations. *West*, 146 Wn. App. at 112. The *West* court held that the superior court erred because it concluded that disclosing the records would harm *future* lease negotiations with other potential lessees. *Id.* at 118. But because the lease had *been executed* (and thereby implemented) at the time the PRA request was received, the records were no longer pre-decisional.[9] *Id.* at 117.

Here, RCW 41.80.010(3) sets out a specific procedure for the implementation of CBAs negotiated between unions and state agencies. In collective bargaining agreements with state agencies, the statute contemplates a multi-step process in which both the governor and the legislature play a role outside of the bargaining conducted between the union and agency representatives.

In this case, whether we deem the expiration of the deliberative process exemption to have occurred at the time the tentative CBA was *presented* to the legislature or at the time it was approved and funded by the legislature, neither of those events had occurred when OFM denied CADF's PRA request. While the tentative agreements had been signed at that point by state and union representatives, they had not yet been presented to the governor for approval or presented to the legislature for funding. The director of OFM sent the tentative agreements to the governor on December 14, 2022. The governor presented the agreements to the legislature as part of the

---

[9] The opinion in *West*, in so many words, faulted the superior court for focusing on the second *PAWS* factor—that disclosure would be injurious to the deliberative or consultative function of the process—without first considering whether the documents in question were actually pre-decisional.

proposed budget bill at the beginning of the legislative session which began in January 2023.[10]
The legislature funded the budget bill, thereby funding the CBAs, on April 23, 2023.[11] The
governor signed the budget bill on May 16, 2023, notably after vetoing other aspects of the bill.[12]

Insofar as CADF argues that the tentative CBA was implemented by the mere *signing* of
the agreement by each parties' bargaining representative, CADF cites no authority for this
proposition and it is belied by the plain language of RCW 41.80.010. Where, as here, "no
authorities are cited in support of a proposition, the court is not required to search out authorities,
but may assume that counsel, after diligent search, has found none." *DeHeer v. Seattle Post-
Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

We additionally note that we are not bound by Division One's decisions in *ACLU I* and
*West*, and to the extent that those decisions can be read as shortening the period of time in which
the deliberate process exemption applies by setting its expiration at an earlier point than that set
by *PAWS* (when the proposal is *presented* to the legislative authority as opposed to when the
proposal is formally implemented by the legislative authority), we are bound by *PAWS*. Pursuant
to *PAWS*, the deliberative process exemption expires when the proposal is *implemented*, not merely
*presented*.

---

[10] *See* WASH. OFF. OF FIN. MGMT., A GUIDE TO THE WASHINGTON STATE BUDGET PROCESS (Aug.
2023).

[11] *2023-25 Enacted Budgets*, WASH. OFF. OF FIN. MGMT.

[12] The governor's partial veto demonstrates that even after the legislature funds a budget bill
containing CBAs, the governor is still able to veto aspects of that bill prior to signing, meaning
that portions of the budget bill (including proposed CBAs) could be vetoed, thereby preventing
their implementation. *2023-25 Enacted Budgets*, WASH. OFF. OF FIN. MGMT.

The original offer letters that were the subject of this PRA request were pre-decisional at the time of CADF's request. The CBAs were tentative, and they had not been presented to the governor for approval or to the legislature for funding. As such, the superior court erred in finding that the deliberative process had concluded by the time CADF submitted the public records request in October 2022.

## II. ATTORNEY FEES, COSTS, AND STATUTORY PENALTIES

After concluding that OFM violated the PRA, the superior court ordered OFM to pay $1,104 in statutory penalties, and $33,172.51 in attorney fees and costs. Because the superior court erred in finding that OFM violated the PRA, it follows that the court erred in awarding attorney fees and costs to CADF and ordering OFM to pay the statutory penalties for withholding the records. Accordingly, we reverse the superior court's order that OFM must pay CADF attorney fees and costs, as well as statutory penalties.

## CONCLUSION

We hold that the superior court erred in finding that the deliberative process exemption had expired when OFM denied CADF's request for the original offer letters pertaining to the collective

No. 58331-3-II

bargaining process. We reverse.

CRUSER, C.J.

We concur:

MAXA, J.

CHE, J.

16