**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 26, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 26, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| CITIZEN ACTION DEFENSE FUND, a Washington nonprofit organization, | ) ) ) | No. 103370-2 |
| Petitioner, | ) ) | |
| v. | ) ) | En Banc |
| WASHINGTON STATE OFFICE OF FINANCIAL MANAGEMENT in the OFFICE OF THE GOVERNOR, an agency of the State of Washington, | ) ) ) ) ) | Filed: June 26, 2025 |
| Respondent. | ) ) ) | |

JOHNSON, J.—This case is about whether the Public Records Act (PRA) deliberative process exemption statute, RCW 42.56.280, applies to the initial offers for collective bargaining agreements (CBAs) once the tentative CBAs have been signed by the parties and submitted to the Office of Financial Management (OFM) director, but have not been signed by the governor or funded by the legislature. Essentially, we have been asked to determine what event or action in the collective bargaining process between the State and the unions ends that deliberative process,

such that the State is required to disclose records related to that negotiation. Because that deliberative process must follow a statutorily mandated sequence of events that culminates with "implementation" when the legislature approves funding for the CBAs, we hold that the deliberative process exemption continues to apply until the legislature has funded the CBAs.[1] The Court of Appeals is affirmed.

FACTS AND PROCEDURAL HISTORY

Chapter 41.80 RCW dictates the procedure for the negotiation of collective bargaining agreements with the State of Washington. This process begins with meetings between State representatives and union representatives, who are obligated to bargain in a good faith effort to reach agreements with respect to enumerated subjects, including wages, hours, and other terms of employment.[2] When these representatives come to a tentative agreement about the terms of the CBA, the tentative CBAs are then submitted to the union's members for

---

[1] Contrary to the assertions of the dissent, our holding is limited to the narrow question presented by the parties and should not be construed to hold that "the deliberative process exemption applies as a blanket exemption covering all documents created as part of a negotiation before a final action is taken." Dissent at 17. We do not address the trial court's determination that the initial offers were covered by the deliberative process exemption during the "deliberative process" because we need address only the question of what event should be considered the end point of that process for the purpose of the exemption.

[2] *See* RCW 41.80.005(2) ("'Collective bargaining' means the performance of the mutual obligation of the representatives of the [state of Washington] and the exclusive bargaining representative [of the employees] to meet at reasonable times and to bargain in good faith in an effort to reach agreement with respect to the subjects of bargaining specified under RCW 41.80.020."), .020(1) ("Except as otherwise provided in this chapter, the matters subject to bargaining include wages, hours, and other terms and conditions of employment, and the negotiation of any question arising under a collective bargaining agreement.").

ratification. From there, the "negotiation," "ratification," and "implementation" process is dictated by RCW 41.80.010(3): (1) the CBAs have to be submitted to the OFM director, then (2) the OFM director has to certify that the CBA is financially feasible, then (3) the governor has to submit a request for the "funds necessary to implement" the compensation and benefit provisions "or for legislation necessary to implement the agreement," and finally, (4) the legislature "shall approve or reject the submission of the request for funds," and "[i]f the legislature rejects or fails to act on the submission," the parties can either reopen all or part of the CBA to continue negotiation or invoke RCW 41.80.090's third-party mediation procedure.

Here, the parties agree about the factual sequence of events leading to the Citizen Action Defense Fund's (Fund) PRA request. Representatives from OFM and union representatives began negotiations for various CBAs for the 2023-2025 biennium before June 2022. Tentative CBAs were signed by representatives from both the State and the union, and then the tentative CBAs were submitted to the OFM director prior to October 1, 2022.

On October 20, 2022, the executive director of the Fund made a public records request to OFM for the original proposals made by the union and the State for the 2023-2025 collective bargaining cycle. OFM did not provide the Fund the original proposals and instead responded to the Fund on October 26, 2022,

explaining OFM's interpretation that the original proposals are exempt from disclosure under RCW 42.56.280 until the agreements are final. OFM reasoned that original proposals, like other negotiation-related material created during the collective bargaining process, are exempt from disclosure under the PRA's deliberative process exemption, RCW 42.56.280.

On December 12, 2022, the OFM director certified the CBAs as financially feasible for the State and then sent the CBAs to the governor. Then, the governor presented the proposed budget to the legislature and requested funding to implement the negotiated agreements prior to the start of the legislative session in early January 2023. As required by RCW 43.88.583,[3] OFM then posted the tentative CBAs to its website within 45 days of submission to the agency along with a summary of the agreement from the chief human resources officer for OFM's State Human Resources Division (CBA summary). The legislature passed a bill approving the funds for the proposed budget on April 23, 2023, and the governor signed the budget bill, after vetoing certain provisions, on May 16, 2023.

---

[3] "(1) To facilitate public inspection of state collective bargaining agreements, the office of financial management must maintain a website that is accessible to the public of all agreements collectively bargained with state employees . . . . Tentatively agreed to collective bargaining agreements must be posted to the website in a searchable format within forty-five days of being submitted to the office of financial management. . . .

"(2) To facilitate public understanding of state collective bargaining agreements, the office of financial management must prepare a summary of each agreement subject to subsection (1) of this section for posting on the website by December 20th of the year in which the agreement was negotiated, but no later than the date that the governor submits a request for funding to the legislature."

The lead negotiators and union leadership then provided final signatures on the CBAs, which took the place of the signatures on the tentative CBAs, and the new CBAs took effect on July 1, 2023.

On December 15, 2022, the Fund filed a lawsuit against OFM, alleging violations of the PRA for failing to timely disclose the State's and union's original offers. The Thurston County Superior Court found OFM to have violated the PRA by withholding the records because the deliberative process exemption did not apply. The superior court found OFM had established that the records satisfied three of the four factors this court articulated for the application of the exemption in *PAWS*,[4] but that the exemption is "time limited" and no longer applied when there is a final decision at the time of the PRA request. Clerk's Papers (CP) at 191. Therefore, the superior court reasoned the exemption did not apply because "once the [CBAs] are signed by the state's negotiation representative and the union, the deliberative process has concluded." CP at 192. The Court of Appeals reversed, holding that the records still fell under the deliberative process exemption because they had not been presented to the governor for approval or funded by the legislature, and thus the agreements were not yet final and OFM was not obligated to disclose the records at that time. *Citizen Action Def. Fund v. Off. of Fin. Mgmt.*,

---

[4] *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 884 P.2d 592 (1994) (PAWS) (plurality opinion).

31 Wn. App. 2d 633, 636 552 P.3d 341 (2024). We granted review.[5] 3 Wn.3d 1031 (2024).

ANALYSIS

The PRA requires state and local agencies to disclose any public record upon request, with some limited exemptions. *PAWS*, 125 Wn.2d at 250. The stated motivation behind the PRA is that access to information about the government's conduct is "fundamental and necessary" to the governance of a free society. RCW 42.17A.001(11). PRA exemptions are narrowly construed in favor of disclosure. *Soter v. Cowles Publ'g Co.*, 162 Wn.2d 716, 731, 174 P.3d 60 (2007) (plurality opinion).

At issue here is RCW 42.56.280, the deliberative process exemption to the PRA, which provides, "Preliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended are exempt under this chapter, except that a specific record is not exempt when publicly cited by an agency in connection with any agency action." RCW 42.56.280. In *Hearst Corp. v. Hoppe*, we held that the purpose of this

---

[5] We have accepted amici briefs from the Washington Coalition for Open Government; the Washington Policy Center, Washington Business Properties Association, and Mountain States Policy Center; and the American Federation of Teachers Washington, Public School Employees, SEIU Local 925, SEIU Local 1199 Teamsters, Local 117, Washington Federation of State Employees, Washington Public Employees Association, and Washington State Labor Council.

exemption is to allow "frank and uninhibited discussion during the decision-making process," and this purpose "severely limits [the exemption's] scope." 90 Wn.2d 123, 132, 133, 580 P.2d 246 (1978). In *PAWS*, we provided the following analytical framework to determine whether the exemption applies:

> In order to rely on this exemption, an agency must show [1] that the records contain predecisional opinions or recommendations of subordinates expressed as part of a deliberative process; [2] that disclosure would be injurious to the deliberative or consultative function of the process; [3] that disclosure would inhibit the flow of recommendations, observations, and opinions; and finally, [4] that the materials covered by the exemption reflect policy recommendations and opinions and not the raw factual data on which a decision is based.

125 Wn.2d at 256 (citing *Columbian Publ'g Co. v. Vancouver*, 36 Wn. App. 25, 31-32, 671 P.2d 280 (1983)). Records that are covered by this exemption cease to be protected once "the policies or recommendations are implemented." *PAWS*, 125 Wn.2d at 257 (citing *Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d 788, 799-800, 791 P.2d 526 (1990)).

Applying the deliberative process exemption to the public employee collective bargaining process, the parties agree that records related to that process cease to be protected by the exemption when that deliberative process is complete. The parties have not challenged the trial court's findings that three of the *PAWS* factors—those unrelated to the timing of the request—were satisfied, and the Court of Appeals did not address them. Rather, the parties agree that the only task before

this court is to determine the point in the statutorily designed public collective bargaining process when the deliberative process has ended, subjecting the records related to that process to mandatory disclosure. Suppl. Br. of Pet'r at 4, 6; Suppl. Br. of Resp't at 13-14. In other words, the issue before us today is not how narrowly the deliberative process exemption should be construed or how the *PAWS* factors apply to the collective bargaining process context—the only question is at what point the records related to the collective bargaining process that have been determined to be covered by the exemption cease to be protected because the policies or recommendations have been implemented.

The Fund offers two alternative theories as to why the deliberative process ended before its PRA request was made on October 20, 2022: that the State's initial offer in the bargaining process reflects the OFM's final policy decision about what its initial offer should be and those initial offers end the deliberative process or, alternatively, the proposed agreements submitted to the legislature represent the agency's decision and the signature of the proposed agreements end the deliberative process. The Fund argues that timeliness is a central component of the PRA's disclosure requirements, and thus we should find that a decision occurs at the "earliest reasonable time" to reach the narrowest reading of the exemption. Suppl. Br. of Pet'r at 12. In further support of the second theory, the Fund argues the deliberative process ends when both OFM and the bargaining representatives

have signed the proposed agreements because at that point both parties become bound, and the failure of funding from the legislature does not void the agreement but requires the parties to reopen negotiations. The Fund argues the legislature approves *funding* for the proposed agreements, but does not approve the proposed agreements themselves, and thus the legislature is not a participant in the negotiation process but merely has a "de minimis" role. Therefore, the Fund argues funding is a new decision, rather than a continuation of the deliberative process that achieved the proposed agreements.[6]

OFM argues the bargaining process continues until the CBA is funded by an appropriations bill enacted into law. OFM argues that under *PAWS*, the deliberative process ends for the purpose of the exemption when the government has *implemented* the draft or policy recommendation for which disclosure is sought—in the context of public sector collective bargaining, this means the deliberative process ends when the CBA can be implemented. Suppl. Br. of Resp't at 21. OFM argues this interpretation is necessary to protect the public sector

---

[6] For the first time on appeal, the Fund also argues here that OFM waived the deliberative process exemption as to all documents related to the collective bargaining process when it published the tentative CBAs and the CBA summary because the CBA summary referenced what the agency "prioritized," "sought," and "offered" during negotiations. However, the court will not consider arguments not made to the Court of Appeals. *In re Pers. Restraint of Tobin*, 165 Wn.2d 172, 175 n.1, 196 P.3d 670 (2008). Based on the record and the plain language of the deliberative process exemption, even if we were to reach this argument, we find it unpersuasive. *See* RCW 42.56.280 ("a *specific record* is not exempt when publicly cited by an agency in connection with any agency action" (emphasis added)).

collective bargaining process from public scrutiny and politicization that would hinder the exchange of views, opinions, and proposals that are vital to collective bargaining. Here, OFM argues the Fund's request occurred several statutorily required steps prior to the end of the negotiation process because, at the time of the Fund's request, the governor had not requested funding for the agreements from the legislature, the legislature had not approved funding, and the governor had not signed the appropriation bill. Thus, the CBA could not be "legally or logically" implemented, and the deliberative process exemption continued to apply until the legislature funded the agreements—at which point OFM disclosed the agreements to the Fund. Suppl. Br. of Resp't at 28.

The cases addressing the scope of the exemption are helpful analogs when determining the exemption's end point. In *PAWS*, we held the deliberative process exemption protected "pink sheets," documents containing recommendations to the National Institutes of Health (NIH), regarding whether grant proposals submitted by universities should be approved. Relying on our previous reasoning in *Hearst Corp.*[7] limiting the scope of the exemption based on the exemption's purpose of allowing frank and uninhibited discussion during the decision process, we articulated the four-factor framework that the trial court applied in the present case. We went on to say that records that fall under the exemptions cease to be protected

---

[7] 90 Wn.2d at 132-33.

"[o]nce the policies or recommendations are implemented." *PAWS*, 125 Wn.2d at 257. Thus, we held the "pink sheets foster a quintessentially deliberative process" and were exempt from disclosure under the exemption, but they nonetheless became disclosable when the proposal became funded by the NIH because at that point the proposal "clearly becomes 'implemented' for purposes of [the deliberative process] exemption." *PAWS*, 125 Wn.2d at 257. Here, the parties do not dispute that the trial court properly applied this four-factor framework to determine that the initial offers from the State and the union negotiators fell under the exemption; the only issue on appeal was whether the trial court was correct in finding that "once the collective bargaining agreements are signed by the state's negotiation representative and the union, the deliberative process has concluded." CP at 192.

In *American Civil Liberties Union of Washington v. City of Seattle*, Division One considered the application of the deliberative process exemption to collective bargaining agreements. 121 Wn. App. 544, 550, 89 P.3d 295 (2004) (*ACLU*). The court could not determine whether the records, lists of negotiation issues prepared in anticipation of the bargaining process, were predecisional based on the record presented because it could not ascertain whether they reflected the party's final policy decisions without knowing what the records actually contained, how they were created, and who created them. Thus, the court remanded to the trial court on

that issue without deciding whether the lists were predecisional. However, in the interest of judicial economy, the court addressed other issues raised by the parties in *ACLU* that are not raised in this case, including the *PAWS* factors. In analyzing the second *PAWS* factor, the court held that disclosure of the lists would be injurious to the deliberative process because "[u]ntil the results of this policy-making process are presented to the city council for adoption, politicization and media comments will by definition inhibit the delicate balance—the give-and-take of the City's positions on issues concerning the police department." *ACLU*, 121 Wn. App. at 554. Because the case was remanded, the court did not decide whether the deliberative process ended at the time the ACLU made the request for disclosure of the lists at issue.

In *West v. Port of Olympia*, Division One held that the deliberative process regarding lease negotiations between the Weyerhaeuser Company and the Port of Olympia ended when the lease had been executed. 146 Wn. App. 108, 112, 192 P.3d 926 (2008). The court reasoned that the deliberative process exemption no longer applies "once the agency implements the policies or recommendations," and thus documents related to the negotiation for the lease ceased to be protected by the deliberative process exemption because, at the time the PRA request was made, the lease had already been executed. *West*, 146 Wn. App. at 117. The court went on to explain that the trial court erred in finding the exemption to continue to apply

after execution because the trial court had misinterpreted *ACLU*'s discussion of the second *PAWS* factor, injury to the deliberative process, to extend the duration of the deliberative process exemption until disclosure would no longer injure the deliberative process for other leases. The court clarified that *ACLU* did not support this conclusion, and that the *ACLU* court only considered disclosure to be injurious "[u]ntil the results of this policy-making process are presented to the city council for adoption." *ACLU*, 121 Wn. App. at 554. Thus, the court in *West* interpreted *ACLU* to impliedly hold that the deliberative process exemption ceased to apply when the results of the policy-making process were presented to the city council for adoption, and therefore the exemption ceased to apply in *West* because the lease had been executed.

In this case, although the Court of Appeals noted that it was not bound by Division One's decisions in *ACLU* and *West*, these cases support the State's argument because they demonstrate that implementation occurs when the funding process is finalized. These cases consistently focus on implementation as the end point of the deliberative process exemption because, logically, the risk of harm that public disclosure poses to the deliberative process ceases to exist when the relevant policy or recommendation has been implemented. In the context of public sector collective bargaining, at "implementation" the exemption is no longer needed to protect the collective bargaining process from public scrutiny and politicization

that might interfere with the decision-making process because the decision has become "final" in the relevant sense—that is, there is nothing more to be done to effectuate the decision-making. Our inquiry, therefore, is at what point the decision has become implemented or "final" in the sense that nothing more needs to be done. That question is answered by the statutory scheme controlling the public sector collective bargaining process, ch. 41.80 RCW.

Thus, applying the reasoning from these cases, we hold that the deliberative process had not ended when the Fund made the PRA request, which predated the final statutorily required step in the collective bargaining process. The deliberative process ends when the proposals that resulted from the collective bargaining process are implemented under the statutory framework, and in the unique context of collective bargaining between the State of Washington and state employee unions, an express statutory process creates a sequence of events that constitutes implementation. RCW 41.80.010 (titled "Negotiation and ratification of collective bargaining agreements—Funding to *implement* modification of certain collective bargaining agreements" (emphasis added)). These events cannot be separated from one another for the purpose of the exemption because they are each the continuation of a single deliberative process leading to the creation of CBAs. At any point in this process, failure to proceed to the next step does not end the deliberative process, as the State and union are obligated to return to the bargaining

table to continue this statutorily designed process in good faith. RCW 41.80.005(2). The final steps that are expressly required in this statutory process are the OFM director's certification that the CBA is financially feasible, the governor's request to the legislature for funding or other legislation "necessary to implement the agreement," and the legislature's approval or rejection of the request for funding. RCW 41.80.010(3). Here, at the time the Fund made the PRA request, none of these steps had been completed. Thus, the statutory implementation process was not complete, and the proposed CBAs were not "implemented" for the purpose of the exemption.

Contrary to the Fund's argument, the final step required by RCW 41.80.010(3), approval of funding by the legislature, is no mere formality or "rubber stamp": it is a continuation of the deliberative process between the State of Washington and the unions. The legislature is a statutorily required participant in the overall negotiation, ratification, and implementation process. Without the completion of the legislature's final act in the sequence of bargaining events that are created in RCW 41.80.010, the proposed CBAs remain proposals and they have no effect. RCW 41.80.010(3). In other words, without the legislature's approval of funding, the CBAs are not implemented. In such a circumstance, the parties would have to reopen the CBA and continue the bargaining process—they would have to

15

go back to the bargaining table until the legislature funds the CBA.[8] The CBAs are agreements between the employees and the State of Washington—and the legislature is the arm of the government of the State of Washington that approves or rejects funding for CBAs with public employee unions, by statute and by virtue of our form of government. To suggest the legislature is a nonparty or a nonessential actor in the collective bargaining process, when RCW 41.80.010(3) establishes the legislature as a mandatory party to that process, contradicts the plain mandate of RCW 41.80.010(3), and illogically conceptualizes the legislature as an entity removed from the CBA itself—although the legislature is a party to the CBA. Thus, the deliberative process could not have ended prior to the legislature's approval of funding under RCW 41.80.010(3), and therefore the deliberative process exemption continued to cover the negotiation materials at least until the funding was finalized for the CBAs.

This result is also supported by our holding in *PAWS* that the deliberative process exemption ends when the proposal that was the subject of the deliberative process was funded. Per our holding in *PAWS*, the four-factor framework guides the determination of whether the deliberative process exemption applies, but the only inquiry in determining whether the exemption's protection has ceased is

---

[8] RCW 41.80.010(3)(b) ("If the legislature rejects or fails to act on the submission, either party may reopen all or part of the agreement or the exclusive bargaining representative may seek to implement the procedures provided for in RCW 41.80.090.").

whether the policy at issue has been "implemented." *PAWS*, 125 Wn.2d at 257. Here, whether the exemption applies to this collective bargaining process is not at issue, but *PAWS* is still informative because it dictates that the exemption's protection has ceased when the CBA has been implemented. Although *PAWS* considered university grant proposals, rather than collective bargaining agreements, our holding that the grant proposals had been "implemented" when they were funded is applicable here. As in *PAWS*, where the grant review process has a distinct end point when the NIH decides to fund those proposals, the collective bargaining process is not over until the State decides to fund the proposed CBAs. Just as the grant proposals are not implemented if the NIH fails to fund them, the CBAs have not been implemented if they have not been funded, per RCW 41.80.010(3). Accordingly, the requested records become disclosable only when the CBAs are funded, because at that point the CBAs become implemented for the purpose of the deliberative process exemption.

## CONCLUSION

We find the public employee collective bargaining process is complete when the final step in the statutorily required implementation process has been completed. Because the final step in the implementation process set out in RCW 41.80.010(3) is the approval of funding for the CBA, we hold that the collective bargaining process is not complete until the CBA has been funded. Thus, the

deliberative process exemption, to the extent that it covers documents related to collective bargaining that takes place under chapter 41.80 RCW, ceases to protect those documents only when the relevant CBA has been funded by the legislature. Accordingly, we affirm the Court of Appeals.

_____
                                         Johnson, J.

WE CONCUR:

_____        _____
            Stephens, C.J.                              Yu, J.

_____        _____
            Madsen, J.                           Montoya-Lewis, J.

_____        _____
            González, J.                            Whitener, J.

_____        _____
         Gordon McCloud, J.

No. 103370-2

GONZÁLEZ, J. (concurring) — I concur with the majority in full.  I write separately, however, to emphasize that the deliberative process exemption is in effect until the operating budget is final.  The exemption continues until the budget is final under article III, section 12 of the Washington Constitution. That occurs once the operating budget has passed both houses of the legislature and been signed by the governor or been allowed to become law without the governor's signature. CONST. art. III, §12.

With these observations, I respectfully concur.

González, J.

González, J.

No. 103370-2

MUNGIA, J. (dissenting)—In this dispute, the issue is not when the collective bargaining agreement (CBA) was completed—if that were the issue, I would agree with the majority. Instead, the issue in this case is when did the negotiation process end between the Washington State Office of Financial Management (OFM) and the labor unions representing state employees (Union). That deliberative process ended by October 1, 2022, when OFM and the Union reached an agreement.

The people have the right to know what their government is doing. That value is the basis for the Public Records Act (PRA). The presumption is that the public is entitled to information their government holds. Withholding information is the exception, and this court's responsibility is to construe any exemption under the PRA as narrowly as reasonably possible so that information is disclosed and not withheld.

The trial court correctly concluded that the information sought by the Citizens Action Defense Fund (Fund) was within the scope of the PRA and should have been disclosed. The Court of Appeals erred when it reversed the trial court.[1] I would reverse the Court of Appeals and uphold the trial court's ruling that the Fund was entitled to the requested information. Accordingly, I respectfully dissent.

---

[1] *Citizen Action Def. Fund v. Off. of Fin. Mgmt.*, 31 Wn. App. 2d 633, 552 P.3d 341 (2024).

I

UNDERSTANDING THE INFORMATION REQUESTED, WHEN IT WAS REQUESTED, AND THE
APPLICABLE PROCESS IS CRUCIAL FOR IDENTIFYING THE ISSUE

A.  The Fund Asked OFM To Disclose the Opening Offers Between the Parties

The Fund requested that OFM, a state agency, disclose its initial offer to the Union and the Union's initial offer to OFM.  The Fund did not ask OFM to disclose memoranda, notes, or internal e-mails about how OFM reached that decision.  Instead, it asked only for information that both OFM and the Union had.  If the legislature failed to fund the CBA, the requested information, if disclosed, would not provide an advantage to either party in a new round of negotiations.

B.  The Fund Asked OFM for the Information After OFM and the Fund Had Agreed to Terms

By October 1, 2022, the Union and OFM had reached an agreement as to the terms of the CBA.  RCW 41.80.010(3)(a).  The deliberative process for the Union and OFM ended when they had agreed to terms when viewed with the perspective of the documents the Fund was requesting.  A narrow reading of the deliberative process exemption requires identifying the scope of the deliberative process in light of the documents being requested.

The CBA negotiations here involved OFM playing two different roles.  First, OFM was designated by the governor to negotiate the proposed agreement as a representative of the employer.  RCW 41.80.010(1).  Second, after the Union and OFM reach an agreement, the OFM director determines whether the proposed agreement is

2

financially feasible. *See* RCW 41.80.010(3)(b). I would hold the OFM's second role,

determining whether the proposed agreement was financially feasible, was not part of the

deliberative process in light of the documents being requested.

After the OFM director found that funding the proposed agreement was financially

feasible, the only option the legislature had was to fund or not fund the agreement—no

governmental actor could change the terms of the proposed agreement. *See* RCW

41.80.010(3)(b). I would hold the legislature's decision to fund or not fund the

agreement is also not part of the deliberative process at issue. A new round of

negotiations may take place if the legislature failed to fund the agreement, but that would

be an independent deliberative process. *See id*.

C. The Fund Made a PRA Request for the Initial Offers

On October 20, 2022, Jackson Maynard, the executive director of the Fund,

requested OFM to provide a copy of OFM's and the Union's original offers.

On October 26, 2022, Nathan Sherrard, OFM's assistant legal affairs counsel,

responded:

> It is our longstanding interpretation that the exemption in RCW 42.56.280,
> for records that are part of a deliberative process, does apply to negotiation-
> related material created as part of the collective bargaining process, *until
> those negotiations are complete and the agreements are final*. We do not
> consider that process to be complete until the final approval of the contracts
> by the legislature and the signing of that approval into law by the governor.
> Therefore, the records you have requested (the state's and union's original
> offers) are exempt from disclosure until that time.

CP at 111.

3

II

THE PRESUMPTION UNDER THE PUBLIC RECORDS ACT IS THAT THE PEOPLE ARE
ENTITLED TO HAVE THE INFORMATION THAT OUR GOVERNMENT HAS

A. Courts Are Charged with Construing the Deliberate Process Exemption as
   Narrowly as Reasonably Possible

In 1972, the people of this state, by initiative, passed the PRA with the express

goal that government disclosure, not secrecy, would be the norm and the presumption.

RCW 42.56.030; *see also* State of Washington Voters Pamphlet, General Election

(Nov. 7, 1972).  As a result, the following principles guide courts when analyzing an

issue arising out of the PRA, which we review de novo.  RCW 42.56.550(3).

- The PRA must be liberally construed so that the PRA's terms lead to

  disclosure of information to the public.

- Any claimed exemption from disclosure is to be construed as narrowly as

  reasonably possible.

- If the government claims that information need not be disclosed under the

  PRA, it has the burden of demonstrating that there is an exemption that

  prevents the public from obtaining that information.

*See Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 431-39, 327 P.3d

600 (2013); RCW 42.56.550(1).  Further, the PRA allows courts to recognize specific

exemptions for the PRA from other statutes, but it does not allow courts to imply

exemptions for the PRA from other statutes.  *Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d

788, 800, 791 P.2d 526 (1990); *see also Lyft, Inc. v. City of Seattle*, 190 Wn.2d 769, 790,

4

418 P.3d 102 (2018) (holding other statutory schemes do not determine how the PRA operates). The collective bargaining process in chapter 41.80 RCW does not contain a specific exemption for the PRA.

The PRA exemption at issue here, the "deliberative process" exemption, must be construed as narrowly as reasonably possible. The exemption provides:

> Preliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended are exempt under this chapter, except that a specific record is not exempt when publicly cited by an agency in connection with any agency action.

RCW 42.56.280.

While the parties did not brief this issue, it appears from the plain language above that the initial offers made by the Union and OFM would not fall within that definition. The Fund, however, does not challenge the trial court's finding that the initial offers contain opinions and recommendations. Instead, the issue raised by the parties concerns when a decision is implemented for purposes of the deliberative process exemption. Accordingly, I will address that issue.

In order to claim the exemption, OFM has the burden of demonstrating that four conditions exist:

1. "[T]he records contain predecisional opinions or recommendations of subordinates expressed as part of a deliberative process;"

2. "that disclosure would be injurious to the deliberative or consultative function of the process;"

3. "that disclosure would inhibit the flow of recommendations, observations, and opinions; and"

4.      "that the materials covered by the exemption reflect policy
recommendations and opinions and not the raw factual data on
which a decision is based."

*Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 256, 884 P.2d 592

(1994) (*PAWS*) (plurality opinion).  The exemption is in effect as long as all four

conditions continue to be met.  I disagree with the majority's decision not to address all

of these conditions.

In narrowly construing this exemption, it is important to do so with the view of

why the exemption exists.  The purpose of this exemption is to allow government

officials to speak openly while they are deliberating.  *Hearst Corp. v. Hoppe*, 90 Wn.2d

123, 132-33, 580 P.2d 246 (1978).  Politicization before negotiations are complete, for

example, could inhibit government officials from speaking openly.  *Am. C.L. Union of*

*Wash. v. City of Seattle*, 121 Wn. App. 544, 553-54, 89 P.3d 295 (2004) (*ACLU*).

Additionally, if the public could obtain information as to officials' thought processes

before a final decision was made, that could potentially give someone an advantage and,

therefore, inhibit the deliberative process.  To put it in terms of this case, if the public

could obtain OFM's preliminary drafts, notes, recommendations, etc., before OFM and

the Union had reached a binding agreement, then that could potentially give the Union an

advantage and, therefore, inhibit the deliberative process.  In this scenario, the majority's

analysis that those documents fall within the "deliberative process" exemption may be

reasonable because of the purpose of the exemption.

That is not the case here.

The Fund did not request those preliminary documents as defined in RCW 42.56.280 (predecisional decisions or recommendations). Instead, it requested copies of OFM's and the Union's original offers that led to the signed agreement. Disclosure of this information would not inhibit the deliberative process by giving the Union an advantage if the legislature did not fund the agreement. Nor would it give the Union an advantage if OFM determined that funding the agreement was not financially feasible. Accordingly, a court must consider the requested information and the purpose of the exemption when determining the end point of the deliberative process.

It is OFM's burden of proof, not the Fund's, to demonstrate that the deliberative process exemption applies. *See Resident Action Council*, 177 Wn.2d at 434. OFM has the burden of demonstrating that disclosure of the initial offers would be harmful to the deliberative process. *Hoppe*, 90 Wn.2d at 133. In addition, OFM has the burden of showing that the requested documents contain predecisional opinions or recommendations that were part of the deliberative process. *Id.*

By its very nature, the scope of the deliberative process exemption is strictly limited. *Id*. OFM has the burden of demonstrating that releasing the original offers as of October 20, 2022, at least 19 days after OFM and the Union had reached an agreement, would have inhibited the deliberative process going forward. In my view, OFM has failed to meet its burden.

Once again, it is important to note what the Fund requested. It did not request documents that would have disclosed the internal thought processes, or the internal back-and-forth, of OFM. It did not request documents that would have been disclosed if OFM was prepared to offer better terms. We have stated in the past that the deliberative process exemption applies only to those documents that actually reflect policy recommendations and opinions. *Id.* It does not exempt factual data. *Id.* Likewise, it does not exempt documents that reflect any opinions or recommendations actually implemented as policy once they are adopted by an agency of the government. *Id.* Once OFM came to terms with the Union, any prior offers were subsumed as part of the agreement that would be submitted to the OFM director to determine financial feasibility. It is difficult to understand how disclosure of the original offers would impair OFM's negotiations or deliberations going forward when the Union is fully aware of what the initial offers were. In any event, it was OFM's burden to demonstrate how disclosing the initial offers after October 20, 2022, would impair its deliberative process going forward. It failed to do so.

B. <u>Precedent Does Not Support the View of OFM and the Majority</u>

OFM argues that the deliberative process ended when the policy, here the proposed CBA, was implemented by the state funding it and not any earlier. OFM argues:

> Multiple courts have recognized that premature publication of bargaining history jeopardizes the collective bargaining process. For example, the Court of Appeals noted in *American Civil Liberties Union of Washington v. City of Seattle*, 121 Wn. App. 544, 89 P.3d 295 (2004)

(*ACLU*), *review denied*, 168 Wn.2d 1009 (2010), that "it would disrupt and politicize the bargaining process to prematurely publicize the proposals of parties. . . ." 121 Wn. App. at 553 n.20. "Public scrutiny of contract issues discussed prior to completing negotiations might be misconstrued, and disclosure would hinder a vital part of the bargaining process—the free exchange of views, opinions, and proposals." *Id*. The Second Circuit Court of Appeals observed that "negotiation of contract terms . . . requires each party to compromise some or all of its interests in order to achieve a settlement best for the group as a whole." *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1242 (2d Cir. 1979). Accordingly, "the bargaining process could easily be stymied" by publication of the details of the negotiation process. *Id*. Indeed, this Court acknowledged several "significant harms" in the analogous situation of opening up collective bargaining to public observation, such as "inhibiting open exchange in negotiations, setting a discordant tone, encouraging posturing for the record, causing parties to feel overly conscious of their remarks, and politicizing the bargaining process." *Wash. State Council of Cnty. & City Emps. v. City of Spokane*, 200 Wn.2d 678, 690, 520 P.3d 991 (2022). Thus, there are compelling reasons to keep some details of the parties' give-and-take negotiations confidential.

In sum, the relevant task for purposes of determining when the deliberative process ends is identifying when the government has implemented the draft or policy recommendation for which disclosure is sought. *PAWS*, 125 Wn.2d at 257. This is especially important in the context of collective bargaining, which is premised on creative problem-solving and the free exchange of views and proposals in an effort to reach an agreement that can be implemented.

Suppl. Br. of Resp't Wash. State Off. of Fin. Mgmt. at 20-21 (alterations in original).  As

excerpted above, OFM relies on three cases: (1) *ACLU*, 121 Wn. App. at 553 n.20,

(2) *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228,

1242 (2d Cir. 1979), and (3) *Washington State Council of County & City Employees v.

City of Spokane*, 200 Wn.2d 678, 690, 520 P.3d 991 (2022) (*WSCCCE*).

First, OFM argues that the *ACLU* case recognized that premature publication of

bargaining history would politicize the deliberative process.  *Id.* at 20 (quoting *ACLU*,

121 Wn. App. at 553 n.20). The majority relies on similar language from the *ACLU* case.

Majority at 12 (quoting *ACLU*, 121 Wn. App. at 554).

*ACLU*, however, is markedly different than this case. The analysis in the *ACLU*

decision supports disclosure in this case.

In *ACLU*, the parties had just started negotiations. 121 Wn. App. at 548. Unlike

in this case, no agreement had been reached between the parties. The Seattle Police

Officers Guild and the city of Seattle (City) were negotiating a new contract. *Id*. Both

the City and the Guild had exchanged lists of issues they had planned to address in

negotiations. *Id*. The ACLU made a request for a copy of both lists under the PRA. *Id*.

The City refused to provide the lists, claiming the deliberative process exemption. *Id*.

The trial court upheld the City's position. *Id*.

The *ACLU* decision does not support OFM's position. Nor does it support the

majority's analysis. The majority's view is that the Fund is not entitled to the original

offers because the request was made before the deliberative process had ended. The

*ACLU* court, however, stated that to determine whether the deliberative process

exemption applies, the court must consider how the lists were made and their function:

> We must determine in this case whether the lists qualify as
> "predecisional opinions or recommendations . . . expressed as part of the
> deliberative process." Resolving this question turns on how the lists were
> generated and their function in the context of the decision-making process.

*Id.* at 549-50 (footnote omitted) (quoting *PAWS*, 125 Wn.2d at 256).

The *ACLU* court concluded it had to know what documents were actually being

requested by the ACLU to determine whether they fell within the deliberative process

exemption. *Id.* at 550. It accordingly remanded to the trial court for in camera review to

make this determination. *Id*. In short, the *ACLU* court did not adopt the position that the

deliberative process was still ongoing because the parties had not yet reached an

agreement. *Id*.

> The *ACLU* court explained:
>
> The City's negotiators are not free to adopt their own strategies and
> priorities for the city council. Rather, they must confer with the governing
> body on a regular basis to adopt and respond to the proposals and
> counterproposals that emerge from sessions at the bargaining table. . . .
> <u>Until the results of this policy-making process are presented to the city</u>
> <u>council for adoption</u>, politicization and media comments will by definition
> inhibit the delicate balance—the give-and-take of the City's positions on
> issues concerning the police department.

*Id*. at 553-54 (underlining added). In other words, the *ACLU* court was concerned with

politicization and commentary prior to *presentation* to the city council for adoption, not

politicization and commentary prior to the agreement's adoption by the city council. *Id*.

As will be discussed, that holding was made clearer in a later case. The situation in the

*ACLU* decision is the same as in the present case: both governmental entities had

authorized an agency to negotiate the terms and the only authority the governmental

entities had was either to accept those terms or to reject them in total. The Court of

Appeals held that the deliberative process ended not when final governmental approval

was obtained but when the negotiation process had ended.

Next, OFM relies on the Second Circuit decision in *Rosario*, 605 F.2d at 1242.

That case did not involve either the PRA or the analogous federal Freedom of

Information Act, 5 U.S.C. § 552. In fact, it was not even a case about negotiating

contract terms.  Instead, it involved union members suing their union following an

altercation and disciplinary proceedings.  *Id*. at 1233.  Nonetheless, OFM quotes a

portion of the opinion where the Second Circuit disagreed with the union's attempt to

analogize union grievance meetings to collective bargaining sessions.  Suppl. Br. of

Resp't Wash. State Off. of Fin. Mgmt. at 20-21 (quoting *Rosario*, 605 F.2d at 1242).  The

fact that contract negotiations involve compromise does not add to the analysis here.

This case does not involve ongoing negotiations.  Instead, here, OFM had decided terms

that were acceptable to it for the CBA.

Finally, OFM relies on *WSCCCE*, 200 Wn.2d at 690.  That case again does not

involve the PRA.  Instead, the issue in that case was whether a local ordinance that

required collective bargaining negotiations to be open to the public was preempted by

state law and therefore unconstitutional.  *Id*. at 681.  This case does not shed any light on

the issue of when the deliberative process ends for a state agency engaged in collective

bargaining.

In addition to *ACLU*, the majority relies on two cases to support its ruling.

First, the majority relies on *West v. Port of Olympia*, 146 Wn. App. 108, 112, 192

P.3d 926 (2008).  That case, however, like *ACLU*, supports a holding that the deliberative

process exemption does not apply here.

In *West*, three PRA requests were made to the Port of Olympia, seeking

documents relating to the Port's lease negotiations with Weyerhaeuser.  *Id*.  Each request

was made after the lease had been executed.  *Id*.  The Port claimed that the deliberative

process exemption applied and refused to provide a number of documents. The trial

court agreed with the Port. On appeal, the Court of Appeals reversed and remanded.

The trial court had concluded that while the lease negotiations were finalized for

the current lease, some of the requested documents, if disclosed to the public, might

negatively impact the Port's ability to get the best deal in future negotiations. *Id.* at 117-

18. The *West* court reaffirmed the holding of *ACLU* that the deliberative process didn't

end when the city council decided to adopt the proposal but instead it ended when the

agreement was presented to the city council. *Id.* at 118. The *West* court made that clear:

> Thus, the *ACLU* court impliedly held that the exemption applied only until
> the results of the policy-making process were presented to the city council
> for adoption.

*Id.*

That same analysis applies here. The majority is apparently making the argument

that the deliberative process hasn't ended because the legislature might refuse to fund the

CBA and the parties would have to negotiate another deal. That argument was rejected

by the *West* court. The *West* case does not support OFM's position. Instead, the *West*

decision supports the disclosure of the requested documents here.

Using a narrow reading of the exemption, as is required, makes sense. Once

negotiations have ended, the decision-making process has ended for the agency regarding

that particular decision.

The majority next relies on *PAWS*, 125 Wn.2d at 256, as support for its position.

The majority writes:

> Although *PAWS* considered university grant proposals, rather than collective bargaining agreements, our holding that the grant proposals had been "implemented" when they were funded is applicable here. As in *PAWS*, where the grant review process has a distinct end point when the NIH decides to fund those proposals, the collective bargaining process is not over until the State decides to fund the proposed CBAs. Just as the grant proposals are not implemented if the NIH fails to fund them, the CBAs have not been implemented if they have not been funded, per RCW 41.80.010(3). Accordingly, the requested records become disclosable only when the CBAs are funded, because at that point the CBAs become implemented for the purpose of the deliberative process exemption.

Majority at 16-17.

The majority misreads *PAWS*.

*PAWS* involved two sets of records—the first created by the University of Washington (UW) and the second created by the National Institutes of Health (NIH).

*The first set: the UW's unfunded grant proposals*

PAWS requested a copy of an unfunded grant proposal made by the UW to the NIH. *PAWS*, 125 Wn.2d at 247. The majority fails to mention these records.

PAWS made it clear it was not seeking any material in the grant proposals that "might reveal valuable formulae, designs, drawings and research data, trade secrets, or other confidential data." *Id*. at 250. The trial court reviewed the documents in camera and redacted the confidential information. *Id.* The trial court ruled that the remainder of the unfunded grant proposal documents were disclosable. *Id.* The trial court accordingly granted summary judgment in favor of PAWS for those documents. *Id*.

In its appeal before this court, the UW raised a number of arguments that the trial court erred in ruling that the redacted unfunded grant proposals were disclosable. *Id.* at

14

254. One argument was that the documents fell within the deliberative process exemption. *Id.* at 256. We rejected that argument and affirmed the trial court's ruling. *Id.* at 256-57. We noted that it was the agency's burden to show that the requested records contain predecisional opinions or recommendations as part of the deliberative process and the remainder of the four conditions discussed above. *Id.* Contrary to the majority's reading of *PAWS*, we did not hold that by definition, these documents were predecisional because the grant request had not been funded.

*The second set: the NIH's pink sheets*

After the NIH receives grant proposals, it decides whether to fund the request and its comments about the grant proposal are incorporated into a formal evaluation known as a "pink sheet." *Id.* at 248. The pink sheets do not contain the UW's thought processes or deliberations. *Id.* Instead, they contain the NIH scientists' thought processes, recommendations of approval or disapproval, and a funding rank. *Id.* The NIH then gives the pink sheet to the grant applicant. *Id.* If the project is not funded, the grant applicant may revise and resubmit their request. *Id.*

If the grant application is funded, then the grant application, a summary of the proposal, and a budget breakdown are made available to the public. *Id.* at 249. Confidential financial material and material that would affect patent or other rights are not subject to public disclosure. *Id.*

In contrast to the earlier noted materials, we held that the pink sheets were exempt under the PRA's deliberative process exemption. *Id.* at 257.

15

> While the unfunded grant proposal itself does not reveal or expose the kind of deliberative or policy-making process contemplated by the exemption, the so-called "pink sheets" do. Because the pink sheets foster a quintessentially deliberative process, we hold they are exempt from disclosure under this provision, but only while they pertain to an unfunded grant proposal.[5] Once the proposal becomes funded, it clearly becomes "implemented" for purposes of this exemption, and the pink sheets thereby become disclosable.

*Id*.; *see also id.* n.5 ("Of course, merely raw factual data contained in the pink sheets and not covered by any other exemption (such as the valuable research data exemption) is disclosable even where the grant proposal remains unfunded." (citing *Brouillet*, 114 Wn.2d at 800)).

The majority makes too much of our finding that the pink sheets were exempt under the deliberative process exemption. The pink sheets were exempt only until a proposal becomes funded because the deliberative process had not yet ended for them. *See id.* at 257. The majority is using that portion of the opinion as a basis for concluding that the initial offers here are also covered by the deliberative process exemption. That is not the *PAWS* holding. Instead, in *PAWS*, we held that the deliberative process exemption did not apply to all the requested documents. *Id.* We examined the type of document being requested and where those documents fell within the deliberative process. *Id*. The UW created documents were no longer protected by the deliberative process exemption once they were submitted to the NIH (minus the statutorily protected confidential portions). *Id*. The deliberative process exemption did not extend to whether the grant request was funded. In contrast, the NIH created documents were protected by

the deliberative process exemption until the NIH actually funded the grant request. *Id*. at 272.

CONCLUSION

I fundamentally disagree with how the majority frames and addresses the issue raised in this appeal. The majority's view is

> the issue before us today is not how narrowly the deliberative process exemption should be construed, nor how the *PAWS* factors apply to the collective bargaining process context—the only question is at what point the records related to the collective bargaining process that have been determined to be covered by the exemption cease to be protected because the policies or recommendations have been implemented.

Majority at 8. This is not how we review PRA cases.

My view is that this court must construe the deliberative process exemption as narrowly as reasonably possible and, in turn, construe as narrowly as reasonably possible when that process ends for the records being requested. The majority fails to consider the limited purpose of the deliberative process exemption in its analysis. Indeed, the majority fails to follow precedent.

We have never held that the deliberative process exemption applies as a blanket exemption covering all documents created as part of a negotiation before a final action is taken. That, however, is the majority's holding. The majority, without any analysis, simply assumes that all four *PAWS* conditions would continue to exist until the legislature funded the CBA. Instead of a narrow construction of the exemption, the majority is now taking just about as wide a construction as could be made.

17

The majority's view goes against precedent. In the *ACLU* case, the court held that documents involved in the collective bargaining negotiations could be subject to disclosure before they became binding on the parties. 121 Wn. App. at 553-54. The court there held that the documents lost the deliberative process exemption protection when they were presented to the city council. *Id.* In other words, the documents were subject to disclosure once the parties had agreed to terms. *Id.* The *West* case reaffirmed that holding. 146 Wn. App. at 118.

Our *PAWS* ruling is directly contrary to the blanket coverage that the majority is now adopting for the deliberative process exemption. In *PAWS* we looked to the documents being requested to determine when the deliberative process exemption ended. For some documents at issue in that case, the deliberative process had not yet ended, i.e., the NIH's pink sheets. For other documents, the deliberative process had ended, i.e., the UW's unfunded grant proposals. *PAWS*, 125 Wn.2d at 257.

The requested documents at issue here are the original offers made by the Union and OFM. The deliberative process ended when those two parties submitted the proposed CBA to OFM for financial feasibility. At that point, that decision was implemented.

I would reverse the Court of Appeals and, accordingly, respectfully dissent.

_____
Mungia, J.

18